UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
GINA MARIE NOVIELLO,

                Plaintiff,

     - against -

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
----------------------------------------------------------x

**MEMORANDUM & ORDER**
18-CV-5779 (PKC)

PAMELA K. CHEN, United States District Judge:

      Plaintiff Gina Marie Noviello brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the decision made by the Commissioner of the Social Security Administration ("SSA") denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. Before the Court is Plaintiff's motion for judgment on the pleadings, and the Commissioner's cross-motion for judgment on the pleadings. Plaintiff seeks reversal of the Commissioner's decision, or alternatively, remand for further administrative proceedings. The Commissioner seeks affirmation of the decision to deny benefits. For the reasons that follow, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion. This case is remanded for further proceedings consistent with this Memorandum & Order.

# BACKGROUND

I.    **Procedural History**

On January 15, 2015, Plaintiff filed an application for DIB, claiming that she was disabled as of August 6, 2014. (Administrative Transcript ("Tr."[1]), Dkt. 9-1, at 20.) Her application was denied on September 24, 2015, and she requested a hearing before an administrative law judge ("ALJ") on October 15, 2015. (*Id.*) On October 11, 2017, ALJ Brian Battles found that Plaintiff was not disabled.[2] (*Id.* at 22.) Plaintiff appealed to the SSA Appeals Council, who upheld the ALJ's decision on September 25, 2018. (*Id.* at 1–4.) This timely appeal followed.[3] (*See generally* Complaint ("Compl."), Dkt. 1.)

II.   **The ALJ Decision**

In evaluating disability claims, the ALJ must adhere to a five-step inquiry. The plaintiff bears the burden of proof in the first four steps of the inquiry; the Commissioner bears the burden

---

[1] Page references prefaced by "Tr." refer to the continuous pagination of the Administrative Transcript (appearing in the lower right corner of each page) and not to the internal pagination of the constituent documents or the pagination generated by the Court's CM/ECF docketing system.

[2] The Court notes that the ALJ also found that Plaintiff met the insured status requirements of the Social Security Act through December 30, 2019, an issue not before the Court on appeal. (*See id.* at 12.)

[3] According to Title 42, United States Code, Section 405(g),

> [a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to [her] of notice of such decision or within such further time as the Commissioner of Social Security may allow.

42 U.S.C. § 405(g). "Under the applicable regulations, the mailing of the final decision is presumed received five days after it is dated unless the [plaintiff] makes a reasonable showing to the contrary." *Kesoglides v. Comm'r of Soc. Sec.*, No. 13-CV-4724 (PKC), 2015 WL 1439862, at *3 (E.D.N.Y. Mar. 27, 2015) (citing 20 C.F.R. §§ 404.981, 422.210(c)). The final decision was issued September 25, 2018 (Tr. at 4), and the Complaint was filed on October 16, 2018 (Compl., Dkt. 1), rendering this appeal timely.

in the final step. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). First, the ALJ determines whether the plaintiff is currently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If the answer is yes, the plaintiff is not disabled. If the answer is no, the ALJ proceeds to the second step to determine whether the plaintiff suffers from a severe impairment. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is severe when it "significantly limits [the plaintiff's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the impairment is not severe, then the plaintiff is not disabled. In this case, the ALJ found that Plaintiff "ha[d] not engaged in substantial gainful activity since August 6, 2014, the alleged onset date." (Tr. at 12.) Moreover, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease of the cervical and lumbar spine; unspecified depressive disorder; generalized anxiety disorder; post-concussion syndrome; and chronic degenerative labral tearing involving the anterior labrum of the right lower extremity status-post-surgery. (*Id.*) The ALJ further noted that "[m]edical records indicate that [Plaintiff] also has medically determinable impairments of obesity, anal masses, vertigo, bilateral carpal tunnel syndrome, and uterine fibroid." (*Id.* at 13.)

Having determined that Plaintiff satisfied her burden at the first two steps, the ALJ proceeded to the third step and determined that none of Plaintiff's impairments met or medically equaled the severity of any of the impairments in the Listings, including 1.02, 1.04, 12.02, 12.04, and 12.06. (*Id.*) More specifically, the ALJ found that Plaintiff's physical impairments did not meet the listed criteria because "[p]hysical examinations of the claimant do not show evidence of an inability to ambulate effectively . . . [and] there is no medical evidence that supports that [Plaintiff] has an inability to perform fine or gross movements effectively." (*Id.*) With respect to Plaintiff's mental impairments, the ALJ found that Plaintiff has "mild limitation" in understanding,

remembering, or applying information; "moderate limitation" in "interacting with others"; "moderate limitation" with respect to "concentrating, persisting, or maintaining pace"; and "mild limitation" in "adapting or managing oneself." (*Id.* at 13–14.) The ALJ concluded that Plaintiff did not meet the "paragraph B" criteria, as her "mental impairments do not cause at least two 'marked' limitations or one 'extreme' limitation," and she did not meet the "paragraph C" criteria as she testified she could perform some self-care and activities of daily living ("ADLs") without assistance. (*Id.* at 14.)

Moving to the fourth step, the ALJ found that Plaintiff maintained residual functional capacity ("RFC")[4] to perform

> light work[5] as defined in 20 [C.F.R. § ] 404.1567(b) except that [Plaintiff] can frequently, but not constantly push and pull and operate foot controls with the right lower extremity and use their [sic] right (dominant) upper extremity for handling, fingering, and reaching; will need to alternate between sitting or standing positions to alleviate pain and discomfort at 30 minute intervals throughout the day while remaining at the work station; occasionally balance, stoop, kneel, crouch, and crawl; occasionally climb ramps or stairs; cannot climb ladders, ropes, or scaffolds; must not drive a motor vehicle with respect to performing work related duties; can perform simple, routine, repetitive tasks; must work in a low stress job, defined as having no fixed production quotas; can only make occasional decision making, and tolerate occasional changes in the work setting; and can have no more than

---

[4] To determine a plaintiff's RFC, the ALJ must consider the plaintiff's "impairment(s), and any related symptoms . . . [which] may cause physical and mental limitations that affect what [the plaintiff] can do in the work setting." 20 C.F.R. § 404.1545(a)(1).

[5] According to the applicable regulations,

> [l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities. If [a claimant] can do light work, [the Agency] determine[s] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

occasional contact with supervisors and coworkers, but have no contact with the general public with respect to performing work related duties.

(*Id.* at 15.)

The ALJ then proceeded to step five to determine whether Plaintiff—given her RFC, age, education, and work experience—had the capacity to perform other substantial gainful work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). The ALJ determined that "based on the testimony of the vocational expert . . . considering [Plaintiff]'s age, education, work experience, and residual functional capacity, [Plaintiff] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy[,]" such as shipping receiving weigher, office helper, and laundry folder. (Tr. at 22.)

## STANDARD OF REVIEW

Unsuccessful claimants for disability benefits under the Social Security Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits. 42 U.S.C. § 405(g). In reviewing a final decision of the Commissioner, the Court's role is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera*, 697 F.3d at 151 (internal quotation marks omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks and alterations omitted). In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotation marks omitted). However, the Court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012). If there is substantial evidence in the

record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld. 42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013).

## DISCUSSION

Plaintiff was injured in a motor vehicle accident on August 6, 2014. (Tr. at 233.) Plaintiff lists her date of disability onset as the date of the accident (*see id.* at 10) and has submitted voluminous medical records that began immediately following that date (*see generally id.*). Plaintiff argues that, in finding her not disabled, the ALJ "[i]ncorrectly [w]eighed [u]ncontroverted [m]edical [e]vidence." (Plaintiff's Brief ("Pl.'s Br."), Dkt. 15-1, at 19–24.) The Court agrees.

In reaching his conclusions, the ALJ afforded "some weight" to the Agency's psychological consultative examiner Paul Herman Ph.D.; "some weight" to the opinion of the Agency's internal medicine consultative examiner Evelyn Wolf, M.D.; "little weight" to Plaintiff's physician Lawrence Robinson, M.D.; and "little weight" to Plaintiff's psychiatrist Adarsh Gupta, M.D. (Tr. at 18–19.) Because the ALJ's allocation of weight to the medical evidence is not supported by the record, remand is warranted.[6]

I. **Plaintiff's Neurological and Psychiatric Impairments**

Plaintiff has submitted medical records from Lawrence Robinson, M.D., treating neurologist, dating from August 25, 2014 to July 27, 2017. (*See Id.* at 250–62; 286–96; 378–99; 427–34; 711–12.) On August 25, 2014, Dr. Robinson noted his initial impression of Plaintiff: "This patient is status post motor vehicle accident on 08/06/2014 with a post[-]traumatic

---

[6] Plaintiff also asserts that the ALJ misinterpreted the vocational testimony, and that the ALJ's imposition of a different assessment than the Vocational Expert's response to hypotheticals amounted to "subterfuge" and a "denial of due process." (Pl.'s Br., Dkt. 15-1, at 14–19.) As remand is warranted on other grounds, the Court does not reach those questions.

6

syndrome, concussion, post[-]traumatic headache, vertigo, and cognitive impairment. In addition, this patient is status post cervical lumbar strain, myofascial pain. Rule out cervical and lumbar radiculopathy. Rule out disc herniation." (*Id.* at 399.) For the next three years, Dr. Robinson documented multiple positive neurologic and psychiatric symptoms,[7] and stated many times that Plaintiff was not able to return to work.[8] At her July 2017 visit, Dr. Robinson described Plaintiff as

> symptomatically unchanged, her symptoms are chronic. She describes ongoing problems with [her] neck, memory and concentration, [and] depression. She has neck pain and she has significant lower back pain radiating into the right lower extremity with digital numbness. She has occasional numbness and paresthesia extending into both hands. She did have an epidural steroid injection . . . nine days ago without improvement. . . . She states that she [is] unable to sleep due to pain. She continues to have depression and headaches.

(*Id.* at 711.) Dr. Robinson noted Plaintiff's neurological exam as positive for "a depressed mood[,]" and further noted: "There has been weight gain. Her head is normacephalic. There is cervical restriction. There is lumbar restriction. Straight leg raising is restricted bilaterally. . . ."

---

[7] (*See, e.g.*, *id.* at 291 (10/30/2014 note that "[Plaintiff] appears depressed"); *id.* at 285 (5/15/2015 treatment note stating "[t]he patient is tearful and depressed"); *id.* at 390 (7/9/2015 note that "[t]his patient has a prolonged post traumatic syndrome with depression"); *id.* at 389 (7/30/15 note that Plaintiff "appears depressed"); *id.* at 384 (2/18/2016 note that Plaintiff "is tearful"); *id.* at 383 (3/17/2016 note that "[s]he remains psychologically disabled"); *id.* at 380 (8/11/2016 note that "[h]er mood is depressed"); *id.* at 378 (10/13/2016 note stating "[s]he has a depressed mood").)

[8] (*See, e.g.*, *id.* at 294 (9/4/2014 note indicating Plaintiff is unable to work); *id.* at 292 (10/2/2014 note that Plaintiff "remains disabled and unable to return to work"); *id.* at 291 (10/30/2014 note that "[Plaintiff] will be followed closely [as] she remains neurologically disabled and unable to return to work"); *id.* at 289 (12/19/2014 note that "[s]he remains neurological[ly] disabled and unable to return to work"); *id.* at 288 (1/13/2015 treatment note that "[Plaintiff] remains neurological[ly] disabled and unable to return to work"); *id.* at 287 (2/10/15 office note that "[t]he patient remains disabled and unable to return[] to work"); *id.* at 286 (4/3/2015 treatment note that "[Plaintiff] has not been able to return to work"); *id.* at 388 (10/2/2015 note that "the patient remains 100 percent neurologically disabled since the 08/06/14 incident"); *id.* at 387 (10/27/15 note that "Plaintiff "has ongoing neurological disability that would prevent her from returning to work"); *id.* at 381 (7/7/2016 note that "[t]he patient remains neurologically disabled").)

7

(*Id.*)  Dr. Robinson's July 2017 exam was also notable for "decreased pinprick [in the] right upper and lower extremities [with] patchy distribution." (*Id.* at 712.)  Dr. Robinson summarized by stating that "this patient has a prolonged posttraumatic syndrome following a motor vehicle accident of 8/06/14 status post head trauma, cognitive impairment, depression, status post cervical laminectomy, lumbar degenerative disc disease, radiculopathy, chronic headache, [and] chronic pain syndrome." (*Id.*)

During his treatment of Plaintiff, Dr. Robinson referred her for a neuropsychological evaluation, which was conducted by Kathryn Mirra, Ph.D. on June 29, 2015. (*See id.* at 233.)  Dr. Mirra noted that Plaintiff had sustained a concussion in the August 2014 car accident, and "has had significant challenges functioning since." (*Id.*)  Plaintiff's cognitive complaints included "forgetfulness, poor focus and concentration, slowed thinking, and word finding problems." (*Id.*) Dr. Mirra noted that Plaintiff was "reliant upon external compensatory aids" like "taking notes [and] using a calendar." (*Id.*)  Her physical symptoms included "reduced balance, dizziness, and blurred vision, and she attends physical therapy." (*Id.*)  Plaintiff also had "significant trouble sleeping"; "low energy"; "increased depression and anxiety" and "panic attacks." (*Id.*)  On a self-report questionnaire of recent symptoms, Plaintiff "endorse[d] severe depression and anxiety," and "[g]iven the degree of distress and presentation" the examiner discontinued the evaluation and deferred a more comprehensive assessment. (*Id.*)  Dr. Mirra found that "[o]verall, [Plaintiff] is having immense difficulty functioning since [the accident], with significant emotional distress, inefficient sleep, headaches, and subjective cognitive problems.  Presentation is consistent with chronic post[-]concussion syndrome." (*Id.*)

Dr. Mirra, in turn, referred Plaintiff to Adarsh Gupta, M.D., her treating psychiatrist. (*Id.* at 435.)  Plaintiff has submitted medical records from Dr. Gupta dating from July 1, 2015 to June

8

22, 2017. (*See id.* at 435–710.) Throughout that time, Plaintiff consistently presented with symptoms of anxiety, depression, and insomnia; was prescribed psychiatric medication; and was noted to have cognitive impairments. (*See generally id.*) During her last recorded appointment with Dr. Gupta, he noted Plaintiff's initial presenting symptoms as anxiety, depression, and cognitive impairments, and the worsening of her depressive symptoms since her last visit. (*Id.* at 706.) Of note, Plaintiff's mental status exam showed that her "concentration was poor" and that "both [her] short[-]term and long[-]term memory were poor." (*Id.*) Plaintiff's prescribed medications included Trazadone, Topamax, Trintellix, Klonopin, and Doxepin. (*Id.* at 708.) On July 13, 2017, Dr. Gupta filled out a form noting that Plaintiff's "impairment m[et] the criteria for enclosed Listing 12.02 (Organic Mental Disorders)." (*Id.* at 713.)

Despite this extensive and consistent medical evidence, the ALJ afforded "little weight" to both Dr. Robinson's and Dr. Gupta's opinions. (*Id.* at 19.) With respect to Dr. Robinson, the ALJ largely disregarded his opinions because Dr. Robinson "repeatedly opined that [Plaintiff] remained disabled and unable to return to work, but did not express any functional limitations, such as time, weight, or frequency limits, that could be evaluated under a residual functional capacity assessment." (*Id.*) The ALJ afforded little weight to Dr. Gupta's opinions because the doctor "opined that [Plaintiff]'s impairment met the criteria for [listing 12.02]," but "offered no evidence or explanation to support his opinion that [Plaintiff]'s impairment met the criteria for this listing. Dr. Gupta simply checked a box and signed the form." (*Id.*; *see also id.* ("Since there is no supporting evidence for this opinion, little weight is given to it.").) However, in assigning little weight to both of Plaintiff's treating physicians, the ALJ did not consider the approximately two years of progress notes of both Drs. Robinson and Gupta.

9

Furthermore, with respect to Dr. Gupta's opinions, the ALJ disregarded them based on Plaintiff's self-reporting about her ability to do certain ADLs:

> [L]ongitudinal treatment notes from Dr. Gupta indicate that [Plaintiff] had been consistently treated for anxiety and depression during the period at issue, with [Plaintiff] receiving psychotherapy and medication, supporting limitations in her ability to interact with others. [Plaintiff] was consistently noted to have poor concentration and memory, supporting limitations in her ability to understand and remember simple instructions and directions. However, [Plaintiff] reported and testified that she required no assistance with self-care due to mental impairments, required no reminders for personal grooming, could perform light housework such as doing some dishes and watering the plants, and could drive herself to the store unassisted several times weekly to shop for food items, indicating that she retains some functional abilities despite her impairments.

(*Id.* at 20 (citations to the record omitted).)

The Court concludes that the ALJ's decision to give little weight to the medical opinions of Plaintiff's treating physicians, Dr. Robinson and Dr. Gupta, is not supported by substantial evidence and was thus error. "With respect to the nature and severity of a [plaintiff]'s impairments, the SSA recognizes a treating physician rule of deference to the views of the physician who has engaged in the primary treatment of the [plaintiff]."[9] *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks, alterations, and citations omitted). As the Second Circuit has explained:

> An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various factors to determine how much weight to give to the opinion. Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the [SSA's] attention that tend to support or contradict the opinion. The regulations also specify that the Commissioner will always give good

---

[9] Although "[t]he current version of the [Social Security Act's] regulations eliminates the treating physician rule," the rule nevertheless applies to Plaintiff's claim, which was initially filed on September 24, 2015, as the current regulations only "apply to cases filed on or after March 27, 2017." *Burkard v. Comm'r of Soc. Sec.*, No. 17-CV-290 (EAW), 2018 WL 3630120, at *3 n.2 (W.D.N.Y. July 31, 2018); *see also* 20 C.F.R. § 404.1520c.

reasons in her notice of determination or decision for the weight she gives [Plaintiff's] treating source's opinion.

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (internal citations and quotations omitted).

Here, in discounting the medical opinions of Plaintiff's treating neurologist and psychiatrist, the ALJ failed to discuss or elaborate on all of the relevant factors, *see id.*, despite the fact that the ALJ had years of treatment notes from these specialists. Furthermore, to the extent the ALJ believed that these records were insufficient for him to engage in a full analysis of the relevant factors, or were inconsistent with other evidence in the record (*e.g.*, Plaintiff's self-reports about her ADLs), he should have taken affirmative steps to develop a sufficient evidentiary record, including soliciting updated medical opinions from these physicians, or referring Plaintiff for a consultative examination with a neurologist. As courts in this Circuit have held, "the ALJ must make every reasonable effort to help an applicant get medical reports from [her] medical sources" and "must seek additional evidence or clarification when the report from the claimant's medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (internal quotation marks and alterations omitted); *see also* 20 C.F.R. § 416.927(d)(2).

Moreover, it is not within the ALJ's purview to determine that Plaintiff's testimony as to her ADLs somehow negated the evaluation of Plaintiff's treating psychiatrist with respect to Plaintiff's psychiatric impairments. *See Indelicato v. Colvin*, No. 13-CV-4553 (JG), 2014 WL 674395, at *3 (E.D.N.Y. Feb. 21, 2014) (noting that "an ALJ is not a doctor, and therefore is not equipped to make medical judgments"); *Beckers v. Colvin*, 38 F. Supp. 3d 362, 374–75 (W.D.N.Y. 2014) ("It is not proper for the ALJ to simply pick and choose from the transcript only such evidence that supports his determination. Nor is it appropriate for an ALJ to substitute his own

opinion for the findings of medical sources on the record." (internal quotation marks and citations omitted)). Likewise, an assessment of a plaintiff's ADLs "without any explanation as to how those ADLs qualify Plaintiff for employment, does not adhere to the Commissioner's regulations that recognize that individuals with psychiatric disabilities may appear to adequately function in a restricted setting, but still may be unable to meet the demands of a competitive workplace environment." *McColl v. Saul*, No. 18-CV-4376 (PKC), 2019 WL 4727449, at *11 (E.D.N.Y. Sept. 27, 2019) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 (C)(3) ("[The Commissioner] must exercise great care in reaching conclusions about [the Plaintiff's] ability or inability to complete tasks under the stresses of employment during a normal workday or work week based on a time-limited mental status examination or psychological testing by a clinician, or based on [the plaintiff's] ability to complete tasks in other settings that are less demanding, highly structured or more supportive."); SSR 85–15, 1985 WL 56857, at *6 (Jan. 1, 1985) ("[T]he reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day. . . . Thus, the mentally ill may have difficulty meeting the requirements of so-called 'low-stress' jobs."); *Moss v. Colvin*, No. 13-CV-731 (GHW) (MHD), 2014 WL 4631884, at *33 (S.D.N.Y. Sept. 16, 2014) ("There are critical differences between activities of daily living (which one can do at his own pace when he is able) and keeping a full time job.")). The Court finds that, in discounting Dr. Gupta's treatment notes based on Plaintiff's testimony of her ADLs, especially without any explanation as to how those ADLs qualify her for employment, the ALJ committed legal error requiring remand.

The Commissioner also solicited a psychiatric opinion from consultative examiner Paul Herman, Ph.D., the results of which supported Dr. Gupta's conclusions and largely dispelled the relevance and significance of Plaintiff's ADLs testimony. (*See* Tr. at 353–56.) Dr. Herman evaluated Plaintiff on August 3, 2015, and described her functioning as

> sleeping only one to two hours per night, normal appetite, and weight gain of 50 [pounds]. The [Plaintiff]'s sleep difficulties are being evaluated. It has not been specified that [they are] due to pain problems. . . . Whenever asked about depressive and anxiety-related symptomatology or any other psychiatric or psychological difficulties, [Plaintiff] reports that she is completely incapacitated by her depression and her anxiety. She reports that her primary activity is staying at home and "lying down and crying all day." [Plaintiff] reports that in addition to the crying, there is decreased overall activity and social withdrawal. She is fatigued from her mood and lack of sleep and diminished self-esteem. [Plaintiff] also reports that now with her decreased functioning, balance problems, vertigo, forgetfulness, and current overall life circumstances that are compromised because of her post[-]concussive syndrome, she can feel tense, anxious, and overwhelmed easily adding to her decreased activity. No suicidal or homicidal ideation, intent, or plan. No thought disorder.

(*Id.* at 353–54.) Dr. Herman further noted that Plaintiff "had a subjective sense of difficulty finding words"; her affect was "dysthymic"; her mood "depressed"; her attention and concentration "somewhat below average"; her "recent memory skills poor"; her "cognitive functioning . . . [d]eficient"; her insight "fair to limited at this time'" and her judgment "fair to limited at this time."

(*Id.* at 354–55.) Dr. Herman described Plaintiff's limitations as follows:

> From a psychological/ psychiatric perspective, there appears to be evidence of moderate to marked limitation with respect to [Plaintiff]'s ability to follow and understand simple directions and instructions, perform simple tasks, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks, make appropriate decisions, relate adequately with others, and appropriately deal with stress. The results of the evaluation appear to be consistent with psychiatric problems and this may significantly interfere with [Plaintiff]'s ability to function on a daily basis.

(*Id.* at 355–56.) Dr. Herman diagnosed Plaintiff with post-concussive syndrome; unspecified depressive disorder; and generalized anxiety disorder. (*Id.* at 356.) He recommended medical

13

follow-up, evaluation, and a day treatment program.[10]  (*Id.*)  Dr. Herman noted Plaintiff's prognosis to be "guarded to poor, given her current symptoms and functioning," and stated that she "will not be able to manage her own funds due to her current symptoms and functioning." (*Id.*)

The ALJ afforded only "some weight" to Dr. Herman's opinion, explaining that

> the record supports that [Plaintiff] has limitations in her ability to concentrate, persist, and maintain pace, interact with and relate to others, understand, remember, and apply information, and adapt or manage herself.  However, the longitudinal record does not support the degree to which Dr. Herman limited [Plaintiff] in these areas as evidence shows that [Plaintiff] was able to perform simple calculations, reported being able to pay bills and handle a checking account, could drive herself several times a week to the store for groceries, attended doctor's appointments daily, and required no assistance with self-care due to her mental impairments, indicating that [Plaintiff] retains some level of functioning in these areas.

(*Id.* at 18–19 (internal record citations omitted)).

For many of the same reasons previously discussed, the ALJ erred by discounting Dr. Herman's opinion regarding Plaintiff's mental impairments on the basis that the opinion was inconsistent with Plaintiff's ability to perform certain ADLs.  Moreover, the ALJ improperly

---

[10] The Department of Health and Human Services, Office of the Inspector General, describes a Continuing Day Treatment (CDT) program in New York as follows:

> CDT services, [are] a form of clinic services, which are administered by its Office of Mental Health (OMH).  OMH's CDT program provides Medicaid beneficiaries active treatment designed to maintain or enhance current levels of functioning and skills, to maintain community living, and to develop self-awareness and self-esteem through the exploration and development of strengths and interests.  CDT services include assessment and treatment planning, discharge planning, medication therapy, case management, psychiatric rehabilitation, and activity therapy, among others.  To be eligible for the CDT program, a beneficiary must have a diagnosis of a designated mental illness and a dysfunction due to a mental illness.

*Dep't of Health & Human Servs.*, *Office of the Inspector General*, *New York Claimed NonHospital-Based Continuing Day Treatment Services that Were Not in Compliance with Federal and State Requirements* (2014), https://oig.hhs.gov/oas/reports/region2/21201011.pdf (last visited January 21, 2020).  Participants in such programs usually receive daily services for part of or an entire day.  *See id.*

"cherry picked" the portions of Dr. Herman's medical report that he found supported the RFC determination, while discounting much of Dr. Herman's medical opinion, including the very high level of care he found appropriate for Plaintiff.

> Federal courts reviewing administrative social security decisions decry "cherry picking" of relevance evidence, which may be defined as inappropriately crediting evidence that supports administrative conclusions while disregarding differing evidence from the same source. "Cherry picking" can indicate a serious misreading of evidence, failure to comply with the requirement that all evidence be taken into account, or both. It is entirely proper for the ALJ to only credit portions of medical source opinions, or weigh different parts of the same opinion differently. However, when the ALJ uses a portion of a given opinion to support a finding, while rejecting another portion of that opinion, the ALJ must have a sound reason for the discrepancy.

*Artinian v. Berryhill*, No. 16-CV-4404 (ADS), 2018 WL 401186, at *8 (E.D.N.Y. Jan. 12, 2018) (internal quotation marks and citations omitted); *see also Smith v. Bowen*, 687 F. Supp. 902, 904 (S.D.N.Y. 1988) ("Although the ALJ is not required to reconcile every ambiguity and inconsistency of medical testimony, [he] cannot pick and choose evidence that supports a particular conclusion." (internal citations omitted)). Thus, the Court finds that the diminished weight the ALJ afforded to particular portions of Dr. Herman's consultative medical report, which found marked limitations in Plaintiff's psychological and mental processing abilities and, notably, were consistent with the opinions of Plaintiff's treating psychiatrist, is not supported by substantial evidence.

For all of these reasons, the Court finds that remand is necessary with respect to the ALJ's weighing of the medical evidence supporting Plaintiff's neurological and psychiatric symptoms.

## II. Plaintiff's Physical Limitations

With respect to Plaintiff's "physical limitations" the ALJ found that

imaging reports indicate that [Plaintiff] had degenerative changes in her cervical and lumbar spine, which are consistent with [Plaintiff]'s complaints of limited range of motion and pain, indicating that [Plaintiff] has some limitations in her exertional and nonexertional abilities. However, nerve conduction study results

15

> indicate no evidence of radiculopathy and later imaging results show no further degenerative changes post-surgery, which are not entirely consistent with [Plaintiff]'s statements about pain, and suggest that further exertional and nonexertional limitations are not supported. [Plaintiff] testified that due to pain, she is unable to remain in the same position for longer than thirty minutes and requires the ability to change positions to alleviate her symptoms. In favor of [Plaintiff], this limitation has been included in the [RFC] finding.

(Tr. at 19–20 (internal record citations omitted).) Plaintiff asserts that, in reaching this conclusion, the ALJ had to "ignore" or minimize many of Plaintiff's symptoms and subsequent treatments, including her leg pain; cervical injury pain; hip surgery; a series of epidural injections in her back and consideration of narcotic therapy; and cervical spinal surgery. (Pl.'s Br., Dkt. 15-1, at 19.)

For the reasons previously discussed, this case is remanded due to the ALJ's improper allocation of weight to the opinions of Plaintiff's treating neurologist and psychiatrist. On remand, the ALJ should also develop more fully the medical record with respect to Plaintiff's physical limitations. As discussed *supra*, "the ALJ must make every reasonable effort to help an applicant get medical reports from [her] medical sources" and "must seek additional evidence or clarification when the report from the [plaintiff]'s medical source . . . does not contain all the necessary information[.]" *Calzada*, 753 F. Supp. 2d at 269 (internal quotation marks and alterations omitted). The duty of an ALJ to develop the record is an affirmative one. *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).

Although the ALJ did not "ignore" the medical evidence in this case, he failed to solicit medical opinion evidence from many of the treating physicians referenced in notes from office visits dating from September 5, 2014 to March 16, 2015. (*Compare* notes from Dr. Vincent Leone, orthopedist (Tr. at 299–317); Dr. Rina Caprarella, M.D., neurologist and pain management specialist (*id.* at 238–39); Dr. Stamatos, pain management practitioner (*id.* at 246–49); Jay Simoncic, M.D., orthopedist (*id.* at 267–71); Dr. Root, M.D., physiatrist (*id.* at 278–84); *and* Dr.

Brin Neri, M.D., orthopedist (*id.* at 341–51 (treatment notes dating from February 3, 2015 to May 29, 2015, including after a surgery of right hip arthroscopy)), *with* ALJ Decision, *id.* at 10–22.) The ALJ's duty to develop the record is especially vital with respect to a treating physician's opinion "[b]ecause of the considerable weight ordinarily accorded to the opinions of treating physicians." *Rocchio v. Astrue*, No. 08-CV-3796 (JSR) (FM), 2010 WL 5563842, at *11 (S.D.N.Y. Nov. 19, 2010), *report and recommendation adopted*, No. 08-CV-3796 (JSR), 2011 WL 1197752 (S.D.N.Y. Mar. 28, 2011). "Therefore, while a treating physician's statement that the [plaintiff] is disabled cannot itself be determinative[,] . . . failure to develop conflicting medical evidence from a treating physician is legal error requiring remand." *Id.* (internal quotation marks omitted) (alterations in the original); *see also Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).

For these reasons, the Court finds that, on remand, the ALJ should further develop the record with respect to Plaintiff's physical impairments.

## CONCLUSION

For the reasons set forth above, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion. The Commissioner's decision is remanded for further consideration consistent with this Memorandum & Order. The Clerk of Court is respectfully requested to enter judgment and close this case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: January 21, 2020
       Brooklyn, New York